## FORD ANDERSON
*vs.*
## CITY OF DANBURY

Superior Court      Fairfield County      File No. 60473

MEMORANDUM FILED JULY 23, 1940.

*Wilson, Hanna & Wanderer*, of Danbury, for the Plaintiff.

*Thomas Keating*, of Danbury, for the Defendant.

McEVOY, J.   The plaintiff is a resident and taxpayer of the City of Danbury.

The city, purporting to act through its mayor and a "Police Committee", entered into an agreement with the Duncan Meter Company, an Illinois corporation, for the purchase of 450 parking meters by the city at $65 per meter. The plaintiff seeks an injunction to restrain the defendant, or its officers, agents, representatives or employees, from the installation and use of the meters, and from paying any funds to the Duncan Meter Company in connection with the contract.

The main alleged reason for the granting of the injunction, as appears in the complaint, is that the charter of the defendant city, as amended by the Special Acts of 1935, No. 485, p. 310, provides for the office of purchasing agent, and it is the claim of the plaintiff that the Act provides that "all purchases, supplies, materials, equipment and other personal property required by the City in each of its departments, amounting to

more that $5, be purchased through the purchasing agent and as a result of competitive bidding conducted by such agent."

Such a provision is contained in the amended city charter, as now in force.

The requirement that the purchasing agent act sets out in detail the method of his action. In section 3 of the amendment to the city charter it is provided, amongst other requirements, that "when it shall be necessary or proper for any department of the city to purchase goods, wares, merchandise, equipment, supplies and other articles of personal property....the commis-sioner or chief in charge of the department....shall make requisition therefor in duplicate, *itemizing the articles* to be purchased...." (The italization is mine and is not contained in the charter.)

In section 4 it is provided that "supplies, materials and equipment in common use by other than one department or used in large quantities by one department may be purchased for stock by the purchasing agent...."

In section 5 it is provided that "the purchasing agent shall require monthly reports of stores on hand...."

In section 6 it is provided that "the city treasurer shall not pay any bill for supplies, materials or equipment that does not bear the certification of the purchasing agent that the correct quantity and quality has been received."

In section 8 it is provided "the purchasing agent, in coopera-tion with the officials of the city, shall provide for the standard-ization of materials, supplies, and equipment in accordance with the use to which the various articles are to be put...."

In section 12 it is provided that "all bids shall be....opened by the purchasing agent, the chief executive and the city treasurer....," and further that "all articles supplied shall be subject to inspection and rejection by the purchasing agent."

While it was claimed upon the hearing of this application that the plain purpose of the amendment of the charter was to invest the purchasing agent with sole authority to make the purchases for the defendant city and that the purchases were required to be made from the lowest bidder, yet section 15 of the amended Act provides that "the purchasing agent is authorized to enter into all contracts and sign all purchase

orders for materials, supplies and equipment; provided any contract shall first be approved by the chief executive and shall bear his signature." It is further provided, under the provisions of section 15, that "all contracts or purchase orders shall only be made with the lowest responsible bidder....provided, if the purchasing agent shall believe that the public interest would be served by accepting other than the lowest bid, the reasons for accepting such higher bid shall be submitted in writing as part of the award and a copy thereof filed with the city treasurer."

Section 18 of the amended charter provides that "no contract, purchase order or order on stores shall be issued and no obligation incurred unless the city treasurer shall first certify that the treasury contains the money required for such contract, order or obligation in excess of all unpaid obligations, to the credit of the appropriation from which it is to be drawn."

It is undisputed that on June 9, 1940, an agreement in writing, was entered into between the Duncan Meter Corporation and the city. This contract is divided into 18 paragraphs and sets out, specifically, the rights and duties of each party by virtue of its provisions.

It should be observed that, while the city agrees to purchase from the meter company 450 parking meters, the fund from which the purchase is to be made is to accrue from the receipt of the parking fees which are placed in the meters by those who park.

In paragraph 5 of that agreement (Exhibit A), it is provided that the title to all the meters shall remain in the meter company until the full purchase price is paid.

In paragraph 6 it is specifically provided that the meters are to be paid for from the receipts from the operation of the meters, divided between the meter company and the city after the deduction of certain expenditures.

In paragraph 7 of the agreement it is provided that the meter company extends and grants to the city a 12-month trial period for the meters beginning with the date of their complete installation; and that upon the conclusion of the 12-month period,. the city may elect to retain the meters and to become the owner of them upon the payment of the purchase price which, it will be recalled, is to accrue, in its entirety, from parking receipts.

In paragraph 8 of the agreement it is provided that the city may cancel its obligation to purchase and that the meter company, at the expiration of the trial period, at its own cost and expense, promptly remove the meters and repair any damage to the premises occasioned by the installation of the meters.

In paragraph 15 of the agreement the city warrants that "all necessary and proper steps have been taken.... authorizing the execution of this agreement."

In paragraph 16 of the agreement the city "agrees to set up a special parking meter fund into which all receipts from all meters installed hereunder shall be placed and kept. No withdrawals from said parking meter fund, except as herein provided, shall be made until the obligations of the City to the Meter Company hereunder shall be fully paid."

A careful reading of the provisions of the 1935 amending act to the city charter indicates a definite purpose, not only to require that the purchasing agent purchase materials, supplies and equipment, but that his authority be limited to that function, bearing in mind that in accordance with the provisions of section 15 of that amending act, *supra*, that authority is not absolute nor final in the purchasing agent.

On June 4, 1940, the Common Council of the defendant passed the following vote: "That the Mayor and Police Committee be and they are hereby authorized and empowered to cause to be installed parking meters in such numbers and at such locations as they may deem advisable, which parking meters shall be of such design, type and manufacture as shall be selected by the Mayor and Police Committee, and be it further resolved that the Mayor and Police Committee are hereby further authorized to enter into such contract or agreement for the trial and purchase of such meters and upon such terms and conditions as they may deem advisable."

In accordance with that vote an agreement, Exhibit A, was entered into on behalf of the defendant by its mayor and a police committee of three.

One of the claims made by this plaintiff, upon the hearing, is that the city could not act by this committee but was required to act through its purchasing agent because the agreement imposes a liability for the expenditure of city funds, which liability had not been provided for in accordance with the

charter of the city in that no appropriation had been made to meet this liability, nor had any estimate been made of the expense which would be incurred.

On this phase of the matter, however, it should be observed that by the provisions of the agreement, the city did not bind itself nor incur any liability to expend any of its own funds, but that it was specifically provided, in accordance with paragraph 16 of the agreement, that none of these deposits on meters should at any time be mingled with any fund of the city, but that these parking receipts should be kept separate and distinct from any fund of the city, and that only by a *nunc pro tunc* arrangement would these parking receipts at any time, vicariously at least, become the property of the city.

In *Hively vs. School City of Nappanee*, 202 Ind. 28, 169 N.E. 51, 71 A.L.R. 1311, the city was enjoined from entering into a lease for and purchase of land and the erection of a building upon the theory that the attempted lease was a subterfuge to avoid the application of the law. In that case it clearly appeared that, notwithstanding the right of the city to exercise an option in the matter, yet that the city was required "to levy a tax annually to pay the amounts necessary to carry out the contract, and, for all practical purposes, it is clear that the entire liability for the whole bond issue of the building company must and does rest on the school city"—regardless of the alternative provision of the lease. So that in that case it clearly appeared that the contract, although in the alternative, clearly constituted a present indebtedness on behalf of the city, and that equitable relief was in order for that reason.

Likewise, in *Brodkey vs. Sioux City*, —Iowa—, 291 N.W. 171, it appeared that the city had contracted to purchase parking meters, but it also appeared that the city had made an outright purchase and that it was expending its own funds in order to purchase the meters, and that it had not met its obligation to observe the limitations upon the making of expenditures by cities and towns, although it had made the required advance estimates of annual expenditures.

In that case the Supreme Court of Iowa pointedly said (p. 175 of 291 N.W.) : "....the city embarked on an unchartered course, assuming to exercise powers nowhere in the statutes expressly conferred, nor implied therein, nor essential to the purposes of any statute that confers powers on cities. The

untrammeled power that the city assumed to raise and disburse funds solely by reason of authority it conjured out of its own enactments was in derogation of all the limitations and safeguards the legislature has with such care provided to avoid abuses."

"In the case of a contract providing for a conditional obligation on the part of the city, such obligation does not become absolute until the condition is shown to have been performed, or it is proved that the failure to perform the condition is due to the fault of the city." 44 C.J. Municipal Corporations §2232.

" 'The intent of the lawmakers is the soul of the statute, and the search for this intent we have held to be the guiding star for the court. It must prevail over the literal sense and the precise letter of the language of the statute.'....'When one construction leads to public mischief which another construction will avoid, the latter is to be favored unless the terms of the statute absolutely forbid.'....'A statute should be construed, having in view the nature and reason of the remedy and the object of the statute, in order to give effect to the legislative intent.' " *State ex rel. Stamford vs. Board of Purchase and Supplies*, 111 Conn. 147, 161.

It would appear that the primary, and real, purpose of the provisions of the 1935 amendment to the city charter was to require that a purchasing agent be vested with authority to purchase supplies, materials and equipment for the city, and that this was not an absolute authority, but, in the first instance, the duty of the purchasing agent was qualified under certain circumstances, as previously set forth; that it was impliedly, at least, provided that these purchases be paid for out of the funds of the city and in accordance with estimates previously made and appropriations based thereon.

It is found that the provisions of the amended charter of 1935 do not apply to the contract in question, Exhibit A.

It was also claimed that the injunction should issue because the agreement or contract, however the same may be termed, was not had with "the lowest bidder."

"The requirement that municipal contracts shall be awarded to the lowest bidder is intended for the protection of the taxpayers and not for the benefit of the bidders." 19 R.C.L. Municipal Corporations §356.

To put it in another way, "the primary purpose of the manda-
tory requirement for competitive bidding [for public work] is
to prevent fraud and collusion and for the protection of public
funds." *Miller vs. Incorporated Town of Milford*, 224 Iowa
753, 769, 276 N.W. 826, 834.

There was no suggestion, upon this hearing, of any excessive
payments, nor that the price of the meters was excessive or not
the lowest, of similar meters.

The contract or agreement, the carrying out of which the
plaintiff now seeks to enjoin, was actually entered into and
signed on the 19th day of June, 1940. Prior to that time the
matter had been widely discussed and commented upon in the
newspapers in Danbury, and it was a matter of public import
and interest.

After the execution of the contract, the parties thereto im-
mediately proceeded to function under it and in accordance
with the terms of that contract the meter company began the
erection of the 472 poles to which were to be attached an equal
number of parking meters.

Although the attorney who now represents the present plain-
tiff conferred at various times with the attorney for the defend-
ant city, no action was taken for the purpose of securing the
claimed injunction until the 17th of July, 1940.

At the time that the application for the injunction was made,
the meter company had then erected 457 poles at designated
places, and there then remained to be erected only 15 more
poles. The installation of the meters, with the force of seven
men who were then employed, would have required a further
period of one and one-half days. At the time that the applica-
tion for the injunction was made, the amount of the work then
completed in accordance with the contract constituted between
80 and 90 per cent of the entire work which was required.

During the hearing upon the application for the injunction
the question was raised as to the identity of the real plaintiff,
and an inference was left that a rival parking meter company
was interested to the extent of bringing this action. It was
significant to observe that, although the representative of a rival
meter company was present and identified, after the raising of
that question he disappeared from the hearing, and not having
been subpoenaed, was unavailable as a witness.

In view of the whole evidence it would appear that the present plaintiff did not exercise reasonable vigilance in attempting to restrain the carrying out of the agreement.

It would appear that he is reasonably chargeable with laches, which would result in prejudice to each of the parties to the agreement. *Whitmore vs. Hartford,* 96 Conn. 511, 528.

The application for the issuance of an injunction is denied.